Our second case for this morning is Domanus v. Locke Lord. We'll let people shuffle around and then when you're ready, Mr. Michaels, we'll go from you. Good morning. Good morning. May it please the Court, Robert Michaels for Plaintiff's Appellants. This case involves application of the Twombly-Iqbal pleading standard to RICO conspiracy claims. The question is, do the plaintiffs plausibly allege that the lawyer defendants knowingly agreed to perform services of a type that would facilitate the Wiki and the Switch Brothers racketeering activity? So does your notion of this conspiracy require the law firms to know, for example, that there are parties who are trying to loot the corporation for their own personal benefit, or is this conspiracy really just something about who's going to fund the legal fees of officers of the corporation versus the corporation itself? Could you be more specific about what your notion of this conspiracy is? Sure. The conspiracy, the overall objective of the conspiracy was to extract money from KBP on false pretenses for the benefit of the defendants, including to expand and maintain control over KBP. How much money? I mean, if they had taken $100 and put it toward the legal fees, would that be enough, or just the legal fees, or does it have to be more than that? What we've alleged would probably have to be more than that tiny incidental amount. What we've alleged is a systematic plan that the lawyer defendants agreed to, to extract the legal fees of the defendants from KBP, and in the case of Lock Lord, to promote the capital raise, which would have further diluted Dumanis and Kozlowski's ownership. That activity is the core of the conspiracy, and there's no question that we allege the defendants engaged in that racketeering activity. There's also no question that we allege that the lawyer defendants performed services of a type that facilitated it, both with respect to the extraction of the fees and the maintenance of control. I mean, those actions themselves involve mail and wire fraud and money laundering. What's the allegation, and what's the factual detail that Lock Lord and Diener and the others knew that this conspiracy was a broad-based conspiracy to loot the assets, and not just some rather questionable legal ethics about conflicts of interest? I mean, does every lawyer who has a conflict of interest with a client violate RICO? Absolutely not, Your Honor. What we're alleging is that we have satisfied the elements of RICO here. The significance of the ethical violation is simply that the lawyer defendants cannot be presumed as a matter of law to simply have agreed to an ordinary representation when in fact they didn't engage in an ordinary representation. It was anything but an ordinary representation. It sounds like what you're saying is that the accusations of ethical violations are what converted this from normal defense of a civil lawsuit to conspiring in a criminal way. Your Honor, what we're alleging is what makes this a RICO violation is that the lawyer defendants agreed with the defendants who were not their clients, had no authority to act for their clients, to facilitate their operation of KBP through a pattern of racketeering activity. Why isn't the RICO agreement to pay their fees? I mean, and this sort of shady way of hiding them in these other invoices. And in fact, Your Honor, I think maybe this gets to your first question. We don't allege any separate, there's no pre-existing conspiracy, which is a term they're probably going to use this morning. It's a single, ongoing, integrated conspiracy that had the same objective. And in fact, not only did they know… What is that objective? Pardon? It has the same objective. I said, what is that objective? That objective was to loot KBP for the benefit of the defendants, including to expand their control. It meets all of the elements of the pattern test under DeGuao. So the benefit of DeGuao or the other defendants? Let's be clear who we're talking about. Sure. The pattern test, which is what determines whether or not the racketeering acts related to the lawsuit are tied up with the acts that existed outside the lawsuit. Do they involve the same perpetrators, the same victims, the same methods of commission, the same effect? All those things are satisfied. So could you explain then? Because here, I guess you're calling these people the supplemental defendants or some phrase like that. And I'm getting the feeling that everything is being stirred up in the same soup somehow. And I feel that we need to keep clear what these people supposedly did. Sure, Your Honor. What the lawyer defendants did is reached an agreement with people who were not their clients, who they had no obligation to defend. And what was that agreement? It was to pay their fees, right? That agreement was to help them maintain control over KBP, avoid accountability for their prior racketeering acts. What's the evidence that their agreement went that far and it wasn't just an agreement to cover their legal expenses? Because that was the natural consequence of exactly what they agreed to. If the lawyer defendants had succeeded, the defendants would have kept control of KBP, they would have avoided accountability for what they had... They would have won their lawsuit, right? Yes, but they were not their clients. And that's the key point here, Your Honor. Well, do we know they would have won the lawsuit, by the way, just because their legal fees were being paid? Well, it's more than their legal fees being paid. I mean, because allowing that they could not afford to defend this case. The only way they could defend this case is if those fees were extracted from KBP. And indeed, the other key point here is that... But, you know, not everybody who's represented wins. I mean, I guess I'm having a little trouble making that... But, Your Honor, I think what's helpful is, look, these lawyer defendants were people who knowingly agreed to help the defendants operate KBP through a pattern of racketeering activity and get paid for it. They weren't their clients. There's no special rule for lawyers or legal services. Their intent is inferred, their motive, their mental state is inferred from the circumstances like it is for everybody else. There are some special circumstances, counsel, here. Let me, I guess, raise what I see as one of the most fundamental problems that I see here. And that is your extensive reliance in your allegations to show that the lawyer defendants knew about the other defendants' activities by the fact that they, in essence, had read your client's complaint and had read the accusations by the Polish prosecutor. The consequences of your theory seem to point towards a conclusion that a lawyer who defends somebody who turns out to be guilty has joined in a criminal conspiracy with his client. Your Honor, that's not the case, and it's not what we're alleging. Tell me why not. What we are saying is not that they were required to believe, and it's not just the complaint, it's not just the prosecutor statement, it's piles of evidence that uncontestably established their guilt, all of which was consistent with the crazy conduct that the defendants were engaged in in the case. That creates a plausible inference of awareness of the general contours. What they're saying is, hey, we can be held as a matter of law, we have to hold as a matter of law that we disbelieved your complaint. You have to hold as a matter of law that we disbelieved it. We have created a plausible inference of awareness based on the totality of the circumstances. Knowledge is alleged generally. It's inferred from the circumstances. They had everything they needed in front of them, and crucially, they were not their clients. They had everything they needed in front of them. They had accusations. We'll talk about the hard drive in a minute, I hope. But, okay, there's a strong case against the other shareholders who've been in control of the corporation. Can they be defended without conspiring with them criminally? Sure they could have. We haven't sued those defendants' lawyers. Sure they could have. If you're defending your client, it is not natural or appropriate typically to infer a conspiratorial agreement because you have to defend the client no matter what you think. That's what you have to do. And if you're defending the client, you have to read these materials. How could they have defended them without reading, for instance, what the Polish prosecutor had to say? Why do we draw an inference that's a bad inference from reading that? Your Honor, they were not their lawyers. They had no duty to defend them at all. They weren't their clients. But it was all, I mean, as a lawyer, don't you inform yourself about the entire situation that your client finds itself in? That's true, Your Honor, and you should. And certainly if they were going to violate their ethical obligations to take sides wrongly in the case with the defendants, before they had a fiduciary duty, they were at least willfully blind to all of that evidence, which creates all we're talking about here is, is it plausible that they were aware of the general contours of the conspiracy? The only question. Can I ask you one other question here? And that has to do with this rule of corporate neutrality in dealing with derivative claims. Do we know what, how those are handled under Polish law? How, if there is such a. How derivative claims are handled under Polish law. Yes. There is some evidence in the record about how derivative claims are handled under Polish law. It's vaguely similar to how it's handled here. Polish law, for example, strictly enforce a rule of corporate neutrality, stricter than in the United States? Well, I do know that I can't answer that question, Your Honor. But I do know. Isn't that rather central? Pardon? Isn't that rather central here? I don't believe. We're talking about duties running between a Polish corporation and its shareholders and among the shareholders themselves. That's governed by Polish law. Derivative actions are fairly exotic and complex. And the whole premise of your case seems to be that it was unethical for these lawyers to find any kind of alliance with the individual defendants. But is that clear under Polish law? What is clear under Polish law is that Derek, that certainly under Polish law, the lawyers had no ability to take any direction from Derek Lewicki. He had nothing to do, no formal relationship with KBP. They were not allowed to take any direction from Adam Switch. He had been barred from having any role in the management of KBP's affairs. What we're alleging is an agreement between the lawyer defendants and racketeers who weren't their clients to help them. That's all this case is. Who was actually in control under Polish law of the corporation while this litigation was going on? The management board of KBP. And who was that? The management board included at various times Adam Switch's wife. However, there is no reason. I'm sorry, counsel. And who else? We've read your briefs. Please, I know you have a lot you want to say. But it would be helpful to know, this seems to me rather central to the whole issue. Who else was in this management board who had the power under Polish law to direct the defense of the corporation or the representation of the corporation in the derivative litigation pending in the United States? Mrs. Switch. Mrs. Switch. And during the tenure, Mr. Diener was there. Mr. Kolatch was on the management board. He had sent Mr. Diener a letter saying, hey, I'm just confirming that the payments that I'm sending you are for KBP's defense in this case. So he was clearly misled as to what happened, and Mr. Diener didn't respond to that letter from Mr. Kolatch. But, Your Honor, I also believe that given that the case was happening in the United States, and that while the Polish law could govern the internal affairs doctrine, which I think is what you're getting at, of the relations in Poland, that wouldn't change the fact that these parties were adverse as a matter of law, and that we have alleged in agreement there is an adversity in a derivative suit between, and I don't believe that that's based on state law. We were seeking a recovery on behalf of KBP. If it's not based on state law, what's it based on? I mean, I believe, in other words, it has been applied across the country that they are adverse parties. We were seeking a recovery from the defendants for the benefit of KBP. And the lot law defendants, I mean, they admitted that their goal was to make the plaintiff's allegations ring hollow, even if they could be proven to be true. And they were not their clients. They were trying to obstruct a recovery for their own client for the benefit of the defendants. And I understand that allegation, and I certainly understand that. It's a very serious ethical allegation. I guess I'll go back and say again, jumping from the ethical problem to a RICO violation needs to be justified in my mind, because, you know, the ARDC isn't in the RICO business. You know, it's a different matter altogether. And I had understood the broader conspiracy as really a serious looting the corporation. We had our earlier decision where there's, you know, a verdict in this case. There are discovery sanctions. There's a giant penalty on the default judgment. That all strikes me as fine. You know, that's part of this case. But how do we get these people in? Your Honor, we get there by simply applying the standard under 1962D and recognizing, and the Twombly standard and recognizing that there's no special immunity for lawyers. Brower doesn't say perform services of a type other than legal services that facilitate racketeering activity. If it's not their client. But you already agreed that we have to be careful about that, because you agreed with Judge Hamilton that merely representing a criminal defendant or a RICO defendant. Of course. Which is performing services for that person. And that's exactly right, Your Honor. But the difference is when you're representing your own client, it is typically not plausible to infer an agreement with their activities outside the litigation, because you have to defend them regardless. That's not the case here. I see my time is up. Thank you. Did you have a question? I did want to ask you. I won't hold this against you. I did want to ask you to explain what you think a domestic injury, what domestic injury you've alleged to deal with the RJR Nabisco case. Sure, Your Honor. As the RJR case made clear, a domestic injury is typically often contested. It wasn't contested there. And just because a plaintiff is foreign doesn't mean they can't have a domestic injury. KBP had officers here. It was looted here. It had its money plowed into real estate investments here. It had, even though it's a Polish corporation. What injury did it suffer here? Pardon? What injury did it suffer here? And it had its claims in a U.S. lawsuit disrupted as part of the conspiracy. Whether or not those claims were suffered here. Claims disrupted. I'm sorry? Claims disrupted. Okay. Okay, anything else? And its property was looted here through the actions of the defendants. What property was looted here? Money. Bank accounts? American bank accounts? There were, at times, there was certainly in a minimum money that would have been a constructive trust for KBP. There's no question about that. It was looted and kept here. What are we talking about? I mean, well. I mean, the question of whether there's a domestic injury is a factual one that I don't think is teed up at all appropriately for resolution at this stage. Thank you. Okay. We will begin. You're Mr. Feldman. Thank you. Good morning. May it please the court. My name is Edward Feldman. I represent the Lock Lord defendants. I'd like to briefly address the territoriality question that Judge Hamilton asked, and then I'll move on to conspiracy. The RJR opinion presents a dispositive threshold issue on territoriality with respect actually to both the corporation and to the individual defendant claims. With respect to the corporation, the opinion requires an allegation of domestic injury. There is none here in this complaint, and Mr. Michaels tried to articulate a domestic injury and did not articulate a domestic injury. So what do you think would have been necessary? Some statement that funds were leached out of a U.S. bank account or property was bought at an appropriate price or, you know, what would you be looking for? I think it would be if they actually had a U.S. bank account that was looted for purposes of the conspiracy, that would be an example of domestic injury. If they were conducting, actually bought real estate in the United States, if the company had done so, as opposed to what they've alleged, which is that some of the defendants took money from Poland, from the corporation in Poland, from a Polish bank account, and took it to the United States and invested in the United States real estate, that's conduct in the United States, but that's not domestic injury. The injury is felt by the corporation in Poland. Is it? I mean, suppose it was money laundering. You know, they take money out of Poland and they convert it into real estate in the United States, and they launder it in that sense. Would there be any injury since, of course, the corporation, if it's not in their name, can't get it? The injury is still incurred in Poland. There's conduct that is traced to the United States, and in the question of money laundering, you'd have to look at the second RJR holding and determine whether it is the type of money laundering that has extraterritorial reach. Some money laundering does, and some does not. So you'd have to look at both the conduct and the situs of the injury, and even in that situation, Judge, the situs of the injury would be where the company felt the injury, which is in its bank account in Poland, not where the money ends up tracing to. All right. So now I want you to address the conspiracy dimension of this, because this is a 1962D, and if there's a conspiracy claim, then what you're looking for is agreement and predicate acts. What if the agreement took place in the United States? You know, you had evidence that there was a meeting, everybody sits down, has dinner, agrees to loot the corporation. Is that enough of a U.S. connection? This comes up a lot, not just in RICO cases. It comes up in antitrust cases. It comes up in securities cases. That gets to the second holding in RJR, which is whether the predicate acts are domestic or not. Well, I was focusing on the agreement side. You have two things. You have agreement and you have predicate acts. What about the agreement? If the agreement were entered into in the United States, is that enough of a link to U.S. territory to permit a claim to be stated under RICO? I don't think so. I think the agreement has to be to participate in the affairs of an enterprise through a pattern of racketeering activity, and under the RJR holding, that pattern of racketeering activity, the actual racketeering acts have to either be domestic or be foreign but subject to a statute that has extraterritorial reach. So it ultimately would depend. The agreement may well provide venue, may otherwise satisfy other requirements, but under RJR you have to look to the racketeering acts, and you also have to under the Holmes and Beck cases, you have to ask whether those racketeering acts proximately caused injury, the domestic racketeering acts proximately caused injury to the plaintiffs, and that would be the proper analysis. With respect to conspiracy, Mr. Michaels got up here and he, as they did in the brief, he started with the second half of the Brouwer standard, which is knowingly facilitating, but he left off the first part from the Degel case, which I articulated a moment ago, which is a knowing agreement to participate in the affairs of an enterprise through a pattern of racketeering activity. And Judge Shah's opinion meticulously went through each of those elements, starting with knowledge, then agreement, and then finally asking in connection with the agreement whether it was an agreement to the same pattern, alleged pattern of racketeering activity, as what was alleged with respect to the underlying Polish real estate conspiracy. So you're in the uncomfortable position of arguing that your clients, while not paying particular attention to who they were representing, didn't go all the way toward knowing that there was this RICO enterprise in the form of the effort to loot this corporation, right? I'm actually not uncomfortable articulating it, Judge. Well, it looks like they were hiding invoices and representing people who were not their clients. They got kicked off the case at some point. It doesn't seem like a great performance, actually. Well, Lock Lord is not alleged to have done anything improper with its invoices or hidden invoices. With respect to how it proceeded in the case, everything it did was open to scrutiny ultimately by the court and then presented ultimately to the court for decision. Whether it's objecting to discovery, which ultimately would get resolved by a court, and this gets to the questions that were asked earlier of Mr. Michaels about who would ultimately win the case. Let's assume their allegations are correct, that Lock Lord really had de facto clients instead of the actual nominal client. If they had succeeded in winning the case for those de facto clients, it would really be no different than any lawyer representing a defendant in a conspiracy case and winning. It would be because they presented evidence that persuaded the trier of fact that the underlying allegations were, in fact, not true. Now, whether the lawyers committed some ethical violation, we disagree with that, but if you assume for argument that they did, there are remedies potentially for such violations. But saying that the ethical violation is a RICO violation, is a knowing agreement with the alleged conspiracy dating back 10 years, is a far leap to go. What this case really is, is potentially at most a state law claim for breach of fiduciary duty or legal malpractice for disgorgement of legal fees paid by the corporation that should not have been paid. But they didn't want to do that. They wanted to get to the promised land. The promised land is to try to recover the $400 million that they are going to have trouble recovering, apparently. So to do that, they have to get through two steps. They have to say, this isn't just a conspiracy about a lawsuit, about how to get paid in a lawsuit. This is the big mega conspiracy. And then they have to get past the causation issue that's set forth in the brief. Even if they established joining the big conspiracy, they'd have to get past the Pinkerton problem and show that they're entitled to go retroactively and vicariously to the damages that were incurred in Poland years before the lawyers got involved in the case. They're overreaching in this case. I understand why they're overreaching, but they are overreaching, and this is alchemy converting a, what is essentially a question of an ethical violation and or a legal malpractice claim, they're trying to convert that into a mega RICO case. Mr. Feldman, one thing that Mr. Michaels said, I think several times, was in essence that there's no special rule for lawyers here. And I think that's partly true and partly not true for reasons that we've been talking about. But I guess it would be helpful for me if you could try to articulate the applicable rule here in a way that would leave room for use of RICO against lawyers who conspire with their clients to engage in criminal activity. If you will, the consigliere case. And there are certainly criminal cases that have been brought within this circuit and elsewhere where a lawyer has lent his or I think all his services to an ongoing criminal enterprise. I'd refer the court to some of the cases that are in the briefs where lawyers were found to have engaged in RICO, some in connection with litigation activities, but they were part of a broader pattern of activity where the lawyers were clearly in bed, not just hired to do a lawsuit, but in bed with the clients in a whole range of illegal activity. The Sintolo case from the First Circuit where the lawyer was effectively a consigliere for the mob and was conspiring, he admitted he conspired with the mob boss. He claimed he was acting as a double agent. That was his defense. But to conspire to have a grand jury witness and not give testimony. The Cueto case from this circuit where the lawyer was in business with the client. So the lawyer engaged in some improper behavior in the lawsuit, but that was part of a business activity that he was part of. I'm familiar with the cases, but I guess I'm asking for some help in articulating the line that you think exists between those cases and this one that can be applied at the pleading stage. Well, in conspiracy cases, it's hard to draw a precise line. I think all I can fall back to to answer the Court's question is the standard that Judge Shah applied of knowing agreement to facilitate, to participate in the affairs of an enterprise through a pattern of racketeering activity. If there are well-pleaded allegations of fact that counsel knowingly knew about the contours of the conspiracy, not merely was presented with evidence of it, and agreed to that conspiracy as opposed to agreed to engage in some litigation, and then agreed to a pad that someone would commit at least two predicate acts to further that conspiracy, I think the facts have to drive the situation. I'm afraid I can't provide a bright-line standard in an area in which there are no bright-line standards that I'm aware of from the case law. Thank you very much. Thank you very much, Mr. Feldman. Mr. Carter, you're up next. May it please the Court, Madam Chief Judge. I represent John Diener, as you know. Mr. Diener has been a lawyer in Illinois since 1972. And as you've heard, the plaintiffs are alleging a conspiracy that began in 1997, they allege, dealing with sham contracts and kickbacks and schemes related to a Polish company, a company that Mr. Diener had nothing to do with before his representation of KBP and nothing to do with after his representation of KBP. His sole and total involvement in this case is the 14 months, or a little over 14 months, that he represented the company, from June 2010 to October 2011. What plaintiffs are trying to do is to tie him to a $400 million judgment that they obtained in 2014, or 2013, and then it was affirmed in 2014, by virtue of his litigation conduct and by virtue of his billing arrangement. But what that really is is an attempt to tie him to the conspiracy by virtue of mere association with the conspiracy, which this Court has said you cannot do, as well as by virtue of, at most, considering the allegations that they're very worst, what would be an inadvertent or accidental or negligent association with the conspiracy. And, again, that's something this Court doesn't allow. So would you like to take a stab at the question Judge Hamilton asked me? It sounds like you're saying that if all he's done is provide, I'll say, conventional legal services, that that's almost as a matter of law, not enough of an allegation to tie him to this conspiracy to loot the KBP business entity. I would agree with my colleague, Mr. Feldman, that it's difficult to draw a bright line rule, but when you look at the cases, what you see is an involvement in the overall conspiracy at a much more detailed level. It is not 14 months of involvement, and then you're out. You weren't, Mr. Diener had no involvement. Even if you did really significant things during that 14 months, I mean, suppose, you know, he finds out that these individual defendants are really trying to convert assets of the corporation to their own use. He says, oh, I have a great idea how to do that. In the meantime, he's technically representing KBP. If that were the case, I'm not telling you that you have to accept that that is the case, but if that were the case. In that situation, Judge, which they have not alleged, they have not alleged knowledge here or agreement, but in that situation, you have dealt with the conspiracy you then know, and then you're far closer to a plausible inference of wrongdoing that they don't have, that the plaintiffs don't have here. And that is what happens in some of these other cases that they've cited and that we've discussed in our briefs. But it's not the case that's before you today. And so with respect to the, there's two categories of conduct that plaintiffs are alleging against Mr. Diener. They're focused on his litigation conduct to try and tie him to this conspiracy, and they also allege wrongdoing with respect to his billing arrangement. And I want to just discuss those if I could. So he wouldn't mind starting with the billing arrangement? Yes. With respect to the billing arrangement, the plaintiffs allege that Mr. Diener doctored bills and that he caused KBP to pay legal fees that they otherwise wouldn't have or shouldn't have paid. By concealing them inside the bills, right? That's what they allege, although they don't allege that anyone was actually misled. And, of course, KBP had been paying the Lewickians wage defense costs before Mr. Diener was involved. So if that, that is, for starters, that is not the conspiracy they're alleging. That would then go back to your point that you made earlier, that that would be some separate conspiracy, not a conspiracy to loot a Polish company in Poland starting in 1997. Well, that's why I wanted to know exactly what the conspiracy is, because it makes a difference as to how this case comes out. Yeah, yeah. I mean, they are trying to allege a different conspiracy at most here, which our client would have defenses to if that case ever came. I think it would be a state court case, not before the district court or this court. So we do not believe Mr. Diener did anything that actually misled anyone. But even if you assume that something was off, and the district court did, the district court said that something sketchy happened with respect to the billing, or at least the plaintiffs had raised a plausible inference of that, that doesn't then equate to a plausible inference of knowledge that the underlying Lewickians-Weich conspiracy was a true and real conspiracy. Again, that goes back to the point made earlier that all they had at that point were allegations, which Mr. Diener didn't have any reason to believe or have to believe. And it doesn't show that Mr. Diener then agreed to join that conspiracy and further it. So, Judge, it's not plausible that Mr. Diener would join this conspiracy and join a conspiracy that had been going on since 1997 and then participate in it for 14 months to help one group of shareholders who he had really nothing to do with before or after this case fleece another group of shareholders who he had nothing to do with before or after this case. And because it fails the plausibility standard, this court should affirm the dismissal. All right. Thank you. Ms. Jones. May it please the court. Your Honors, in addition to the reasons that were set forth by my co-appellees, the Kubasiak firm has a separate reason, according to which the dismissal by the district court could be affirmed. And that is that all of the allegations in the complaint against the firm are solely vicarious. There are no allegations that anyone at the firm besides Mr. Diener was aware of the conduct or that the firm took a central role in the underlying conspiracy. The sole allegation is essentially the same thing you would use in a malpractice case to hold a firm vicariously liable for the malpractice of its attorney. In a RICO case like this, that's not enough. And the reason why is set forth in this court's decision in liquid air, which makes it clear that in order to hold an employer vicariously liable for the action of an employee in joining a RICO conspiracy, you have to be able to show that it was the RICO violation that was to benefit the employer, not just the predicate acts. Could you talk about, I think it's the Ashland Oil case, which followed up on liquid air and on this question, because obviously vicarious liability is sort of the norm when we're talking about law firms. Sure, Your Honor, and I think that's exactly the distinction between a RICO case and your typical malpractice case. In the Ashland Oil case, the employer that was held liable was centrally involved in the alleged conspiracy. First of all, there was no question of knowledge because the officers, the people who really entirely controlled that, it was a super payless, the trucking company, were obviously involved in the conspiracy, but also the trucking company was a central part of the scheme to take oil. Mr. Diener was a partner? Mr. Diener was of counsel, but beyond that, it's an issue between the scheme here, as you've heard a lot of argument about, had to do with all of these real estate transactions in Poland, and essentially they're saying, oh, and also we can infer that Mr. Diener joined into this broader conspiracy because he took direction from the wrong person and he was careless in who he took direction from, and he helped the billing for the lawyers, Gordon and Carr, who represented the individuals. But even if that were a plausible inference, and we certainly don't think it is, there are much more reasonable inferences from those facts, but even if so, the fact that you have these predicate acts that of course could be charged to the firm, and we're not denying that if a malpractice case were alleged in state court, and that was dismissed on supplemental jurisdiction grounds, that the firm could potentially be responsible, and in fact if they were proved it certainly would be, but that to take responsibility for these predicate acts, alleged predicate acts, and then jump it to this broader conspiracy is really against the nature of respondeat superior liability. And you can see that in cases like Brady, which the plaintiff's site, which is a Ninth Circuit case, but really follows the same rules in the Seventh Circuit, that explains the purpose of respondeat superior, is because if you're benefiting from an employee's act, you should also be responsible for their mistakes. But here, this is not legal. The $400 million that they're trying to pin on the firm, and on Mr. Diener, and on Locke Lord, doesn't have anything to do with the legal improprieties that are alleged, but this broader conspiracy. And there, there's no possible way that joining in this broader conspiracy had any benefit or really any relationship to the firm's business at all. And you can see that really in the Oakey Semiconductor case, and again, the Ninth Circuit follows the same essential rules on these questions as the Seventh, and has in fact cited a number of Seventh Circuit opinions, including Ashland-Doyle and Liquid Air in the Brady case. And it says, look, there's a distinction between holding an employee, an employer responsible for actions done, like on the job of opening up these accounts and such, that Wells Fargo was supposed to be held liable, but to take a jump and hold the employer liable for an employee's decision to join some completely unrelated underlying conspiracy. There, the theft of semiconductors. Here, the looting of real estate and real estate transactions and looting of a company in Poland is separate. So based on that, Your Honors, thank you. All right, thank you very much. Mr. Michaels, I'll give you an extra two minutes because you've got some questions right toward the end. Thank you, Your Honor. I just want to begin by answering Judge Hamilton's question about what should the rule be here. The rule is the plausibility rule of Iqbal and Twombly. Have we alleged enough to push across the line between possibility and plausibility that the lawyers didn't just goof up and get confused about who their client was, but that they knew what they were doing? That's the rule. They knew what they were doing in the sense of we're representing the wrong clients, or they knew what they were doing in the sense of we are facilitating a massive conspiracy to loot a corporation? Facilitating the defendant's looting, which could be done by doing their bidding in a case where they weren't just not their client, but they were adverse to them as a matter of law. And the way this ends up shaking out is the plausibility analysis can carry all the weight. If you have a case like Sintolo, or if you have a case like Coeto, where the lawyer is representing his own client, but they've got this business relationship together, they've got other stuff going on together, hey, you know what? We can infer there that you've done more than just be an ordinary lawyer. You've joined the conspiracy. Here, just like Sintolo, what makes it plausible is that the people they're assisting are not their client. If these lawyer defendants weren't lawyers, and they assisted them by providing some other type of service to them, we wouldn't hesitate to conclude, yes, it's plausible that they knew enough, and then they facilitated them. That's what the RICO conspiracy standard is. I also want to speak to your question about the nature of the conspiracies here and what really was this all about. And as I had said, it's a conspiracy to loot KBP on false pretenses for the defendant's benefit, but what happened in the lawsuit is really just not that different from what was happening before. They'd submit false invoices to KBP for payment. The money would end up benefiting them, and to the detriment of KBP, whether Derek Lewicki sent an invoice to Poland saying, hey, pay Spectrum for performing consulting services, and the money went into Lewicki's pocket. They sent a bill to KBP, pay for these lawyers, while the lawyers weren't for KBP, they were for the benefit of the defendants. Under the broad pattern test in DeGuelle, there's really no difference between those two. There's certainly not enough difference to say that they're isolated events. I mean, that's the pattern test, isolated events. Okay, maybe you can wrap up. I'll give you one final thought. One last point I'd make about the knowledge of that other activity is this is where the ethical violation fits in. We're not trying to criminalize the ethical violation. What it certainly means is that if they had a duty to KBP and they come into this duty of fiduciary duty, how do they not, they are then obligated to read the materials and understand what happened, and they took a position on all that stuff. They came into court and they said, this case is nonsense, the plaintiff should lose. They took a position on it. They're at least willfully blind. It's at least plausible that they're willfully blind. Okay. To what else was happening. Thank you, Your Honor. All right. Thank you very much. Thanks to all counsel. We'll take the case under advisement.